## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| LATIF A. QASSAS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:09-CV-0208 |
| | § | |
| DAYLIGHT DONUT FLOUR | § | |
| COMPANY, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER

Plaintiff Latif A. Qassas  has sued Defendant Daylight Donut Flour Company, LLC ("Daylight") for breach of contract, fraud, and related claims arising from the parties' business dealings.  Daylight has filed a Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) & (3) and to Dismiss or Transfer Venue Pursuant to 28 U.S.C. §§ 1406(a) and 1404(a) [Doc. # 10] ("Motion").  Defendant has responded, and Plaintiff has replied.[1]  Having considered the parties' briefing, the applicable legal authorities, and all matters of record, the Court concludes that the Motion should be

---

[1] Plaintiff's Response to Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) & (3) and to Dismiss or Transfer Venue Pursuant to 28 U.S.C. § 1406(a) and 1404(a) [Doc. # 13] ("Response"); Supplement to Plaintiff's Response to Defendant's Motion to Dismiss Pursuant to Fed. R. Civ. P. 12(b)(2) & (3) and to Dismiss or Transfer Venue Pursuant to 28 U.S.C. § 1406(a) and 1404(a) [Doc. # 16] ("Supplemental Response"); Reply to Plaintiff's Response & Supplemental Response to Defendant's Motion to Dismiss or Transfer [Doc. # 23] ("Reply").

**granted** because this Court lacks personal jurisdiction over Daylight.[2]

## I.      BACKGROUND

Plaintiff Qassas is a resident of Sugar Land, Texas.  He brings claims against Daylight, which maintains its principal place of business in Tulsa, Oklahoma. Although at least thirty-five donut stores do business in Texas under the Daylight name, none of Plaintiff's claims are related to these Texas stores.  Rather, Plaintiff's claims arise from his efforts to develop international business for Daylight.[3]

In 2006, Qassas entered into a written agreement with John Bond, president of Defendant Daylight Flour Company, by which Qassas would become the international marketing representative of Daylight.[4]   Qassas was to acquire new clients

---

[2]      Two other motions are pending before the Court.  First, Plaintiff has filed a Motion to Lift the Stay on Discovery Per Rule 11 Agreement [Doc. # 28], to which Defendant has responded.  *See* Doc. # 29.  The Court notes that this motion, while seeking to proceed with discovery, does not make any argument regarding necessary discovery of facts pertinent to the personal jurisdiction inquiry.  Second, Defendant filed a letter with the Court requesting an extension of the joinder deadline, *see* Doc. # 24, which the Court has deemed a motion for extension of time.  *See* Doc. # 26.  Plaintiff filed a response and Defendant has replied.  *See* Docs. # 27, 30.  Because this Order dismisses the case for lack of personal jurisdiction, both of these motions are denied as moot.

[3]      Plaintiff's First Amended Complaint [Doc. # 17] (bringing claims for breach of contract, common law fraud, statutory fraud, tortious interference with a prospective contract, and negligent misrepresentation).

[4]      Affidavit [of Latif A. Qassas] in Support of Plaintiff's Supplemental Response to Defendant's Motion to Dismiss for Lack of Personal Jurisdiction and Venue (Exhibit A to Supplemental Response) ("Qassas Affidavit"), at 2-3, ¶¶ 6-10. Qassas states that
(continued...)

internationally, train and open new international stores, and legalize the international contracts.  In return, Qassas would receive 20% commission on all ingredients and equipment plus a $20,000 training fee.[5]  Qassas traveled to Oklahoma to meet with Daylight personnel and to receive training for his role as international marketing representative.[6]

On or about July 8, 2008, Bond terminated Qassas' employment by sending a letter to Qassas' home in Sugar Land, TX.[7]  Qassas' claims in this lawsuit are based on allegations that Daylight failed to compensate him as agreed and usurped his efforts to develop international business.  He filed suit against Daylight in the 215th Judicial District of Harris County, Texas, and the case subsequently was removed to this Court.

---

[4]   (...continued)
the letter memorializing the agreement was mailed to his home in Texas on April 12, 2006.  *Id*. at 3, ¶ 10.  The letter itself does not appear in the record.

[5]   *Id.* at 2, ¶ 7.

[6]   *Id*.  at 3, ¶ 8; Declaration of John Bond (Exhibit A to Reply) ("Bond Declaration"), at 4, ¶ 23 (Qassas traveled to Oklahoma "many, many times"; Bond and Qassas also met in Australia and Romania, but nowhere else and never in Texas).  Qassas points out, as part of his argument regarding this Court's jurisdiction, that for every new client in a foreign country, he legalized the client's contract by having it notarized in Houston, approved by the Ministry of Foreign Affairs in Austin, and approved by the U.S. Embassy in Washington, DC.  Qassas Affidavit, at 3, ¶ 9.

[7]   *Id.* at 4, ¶ 16.  *See* Bond Declaration, at 4, ¶ 21 (Bond fired Qassas by letter in July 2008).

Daylight now has filed a motion to dismiss or transfer, arguing that its contacts with Texas are insufficient to establish personal jurisdiction over it in the Southern District of Texas.  Daylight does not have any offices, warehouses, or facilities in Texas.[8]  It employs no Texas residents and has no agents who are Texas residents.[9]

On the other hand, Daylight has an international business with stores in at least eight foreign countries,[10] and at least thirty-five stores operate in Texas under the Daylight name.[11]  Bond characterizes the donut stores operating under the Daylight name, in Texas and elsewhere, as "customers" of Daylight with whom it has "limited license agreements":[12]

> Under this limited license agreement, customers of Daylight receive the right to use the Daylight name in their business name, and receive a protected territory.  In exchange, these customers agree to purchase Daylight's raw products, for example flour and coffee, for use in the

---

[8]     Bond Declaration, at 2, ¶ 11.

[9]     *Id.* ¶ 10.

[10]    *See* Printed Pages from Daylight's Website (Exhibit C to Supplemental Response, ("Website"), at 12.  Because the Website's pages are unnumbered in Plaintiff's submission, the Court uses the page numbers supplied by the Electronic Court Filing (ECF) system when citing to the Website.  The Website appears on ECF as Docket # 16-5.

[11]    *Id.* at 11.

[12]    Bond Declaration, at 1, ¶ 2.

customers' stores.[13]

Bond further explains that the only revenue Daylight receives from the limited license agreements comes from its customers' purchase of raw materials.[14]  Daylight does not charge a fee for use of the Daylight name, receives no franchise fees, provides no financial support to its customers, and receives "no royalty payments, percentage of sales, or payments of any kind from the sales of its customers' products."[15]  Daylight also does not monitor, interfere with, or manage its customers' operations.[16]

## II.   RULE 12(b)(2) STANDARD

Defendant Daylight seeks dismissal for lack of personal jurisdiction pursuant

---

[13]     *Id.* ¶ 3.

[14]     *Id.* ¶ 4.

[15]     *Id.* at 2, ¶¶ 5-9.  The printed pages from Daylight's Website, provided by Plaintiff, corroborate Bond's statements that Daylights' customers are licensees and that Daylight does not share in the customers' profits.  In describing the "Daylight Donuts Ownership Program," the site explains that "[a]s a Daylight operator, you are a licensee, not a franchisee.  As such, you do not pay a franchise percentage or even an upfront licensing fee.  You simply agree to use Daylight products and processes in exchange for the right to use the Daylight Donuts brand name and trademark." Website, at 6. It further states, "From the beginning, your Daylight Donuts agreement lets you put your money directly into tangibles that will ensure your store's success—equipment, inventory, signage, decor, and marketing.  Your investment stays in your store.  And so do the profits."  *Id.*

[16]     Bond Declaration, at 2,  ¶ 7.

to Rule 12(b)(2).[17]  Plaintiff bears the burden of establishing that Daylight, a non-

resident defendant, has contacts with the forum state sufficient to invoke the

jurisdiction of this Court.[18]  If there is no evidentiary hearing on a motion to dismiss

for lack of personal jurisdiction, the party asserting jurisdiction is merely required to

present facts sufficient to constitute a *prima facie* case of personal jurisdiction.[19]  The

*prima facie* showing may be established by the pleadings, depositions, affidavits, or

exhibits of record.[20]   A court must accept as true the plaintiff's uncontroverted

---

[17]   FED. R. CIV. P. 12(b)(2).  Under the Federal Rules of Civil Procedure, a federal court
sitting in diversity may exercise jurisdiction over a non-resident defendant only if
permitted under state law.  *Alpine View Co. v. Atlas Copco AB*, 205 F.3d 208, 214
(5th Cir. 2000) (citing FED. R. CIV. P. 4(e)(1), 4(h)(1), 4(k)(1)).  The reach of a state
court's jurisdiction is delimited by: (1) the state's long-arm statute; and (2) the Due
Process Clause of the Fourteenth Amendment to the federal Constitution.  *Johnston
v. Multidata Sys. Int'l Corp.*, 523 F.3d 602, 609 (5th Cir. 2008) (citing *Cycles, Ltd.
v. W.J. Digby, Inc.*, 889 F.2d 612, 616 (5th Cir. 1989)).  The Texas long-arm statute
authorizes the exercise of jurisdiction over non -residents "doing business" in Texas.
*Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 204 (5th
Cir. 1996) (citing  TEX. CIV. PRAC. & REM. CODE  § 17.042). The Texas Supreme
Court has interpreted the "doing business" requirement broadly, allowing the long-
arm statute to reach as far as the federal Constitution permits.  *Id.* (citing *Schlobohm
v. Schapiro*, 784 S.W.2d 355, 357 (Tex. 1990)).  Thus, the two-step inquiry collapses
into one federal due process analysis.  *Johnston*, 523 F.3d at 609.

[18]   *Fielding v. Hubert Burda Media, Inc.*, 415 F.3d 419, 424 (5th Cir. 2005); *Mink v.
AAAA Dev. LLC*, 190 F.3d 333, 335 (5th Cir. 1999).

[19]   *Freudensprung v. Offshore Technical Servs., Inc.*, 379 F.3d 327, 342-43 (5th Cir.
2004); *Cent. Freight Lines Inc. v. APA Transport Corp.*, 322 F.3d 376, 380 (5th Cir.
2003); *Alpine View*, 205 F.3d at 214.

[20]   *See Guidry v. U.S. Tobacco Co., Inc.*, 188 F.3d 619, 625 (5th Cir. 1999).

allegations and resolve any factual conflicts in favor of the plaintiff.[21]   The law, however, does not require the court to credit conclusory allegations, even if uncontroverted.[22]

As interpreted by the Supreme Court and Fifth Circuit, a court's exercise of personal jurisdiction over a non-resident defendant comports with constitutional due process requirements when (1) the defendant "purposefully availed" itself of the benefits and protections of the forum state by establishing "minimum contacts" with that state, and (2) the exercise of personal jurisdiction does not offend traditional notions of "fair play and substantial justice."[23]   Both prongs must be satisfied in order for a court to exercise personal jurisdiction over the defendant.

The "minimum contacts" prong is further subdivided into contacts that suffice to confer "specific jurisdiction" and those that give rise to "general jurisdiction." General jurisdiction exists when a non-resident defendant's contacts with the forum

---

[21]   *Freudensprung*, 379 F.3d at 343; *Cent. Freight*, 322 F.3d at 380; *Alpine View*, 205 F.3d at 214.

[22]   *Cent. Freight*, 322 F.3d at 380; *Panda Brandywine Corp. v. Potomac Elec. Power Co.*, 253 F.3d 865, 868-69 (5th Cir. 2001).

[23]   *Moncrief Oil Int'l., Inc. v. OAO Gazprom*, 481 F.3d 309, 311 (5th Cir. 2007) (citing *Int'l Shoe Co. v. Wash.,* 326 U.S. 310, 316 (1945)); *Latshaw v. Johnston,* 167 F.3d 208, 211 (5th Cir. 1999)).

state are "substantial, continuous, and systematic."[24]   The Fifth Circuit has cautioned that general jurisdiction is difficult to establish:

> The continuous and systematic contacts test is a difficult one to meet, requiring extensive contacts between a defendant and a forum. Even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction. Random, fortuitous, or attenuated contacts are not sufficient to establish jurisdiction.[25]

The defendant's contacts with the forum state are evaluated "over a reasonable number of years" up to the date lawsuit was filed, and are to be reviewed *in toto* rather than in isolation from one another.[26]   When general jurisdiction exists, the forum state may exercise jurisdiction over the defendant on any matter, even if the matter is unrelated to the defendant's contacts with the forum.[27]

When a plaintiff asserts specific jurisdiction over a non-resident defendant, the court must determine (1) whether "the defendant purposely directed its activities toward the forum state or purposely availed itself of the privileges of conducting

---

[24]   *Johnston*, 532 F.3d at 609 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-19 (1984); *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 374 (5th Cir. 2003)).

[25]   *Id*. at 609-10 (citing cases) (internal quotation marks, alterations, and citations omitted).

[26]   *Id*. at 610 (internal citations and quotation marks omitted); *Access Telecom, Inc. v. MCI Telecomms. Corp*., 197 F.3d 694, 717 (5th Cir. 1999).

[27]   *Johnston*, 532 F.3d at 613.

activities there," and (2) whether "the controversy arises out of or is related to the defendant's contacts with the forum state."[28]   The fact that a Texas plaintiff suffered some harm in Texas is insufficient to establish specific jurisdiction in this forum.[29] Rather, the focus of the specific jurisdiction inquiry is on "the relationship between the defendant, the forum, and the litigation."[30]   Contacts that are "random," "fortuitous," or "attenuated" do not satisfy the minimum contacts requirement.[31]

If the plaintiff makes a *prima facie* showing of minimum contacts, then the burden shifts to the defendant to show that the court's exercise of jurisdiction would not comply with "fair play" and "substantial justice."[32]   In making a fundamental fairness determination, a court must examine: (1) the burden on the defendant; (2) the forum state's interests; (3) the plaintiff's interest in convenient and effective relief; (4) the judicial system's interest in efficient resolution of controversies; and (5) the states'

---

[28]   *Freudensprung*, 379 F.3d at 343; *Coats v. Penrod Drilling Corp.*, 5 F.3d 877, 884 (5th Cir. 1993) (citing *Burger King Corp. v. Rudzewicz*,  471 U.S. 462, 474 (1985)).

[29]   *Revell v. Lidov*, 317 F.3d 467, 473 & n.41 (5th Cir. 2002); *Panda Brandywine*, 253 F.3d at 869-70.

[30]   *Freudensprung*, 379 F.3d at 343.

[31]   *Moncrief*, 481 F.3d at 312.

[32]   *Freudensprung*, 379 F.3d at 343.

shared interest in furthering fundamental social policies.[33]

## III.   ANALYSIS

### A.   General Jurisdiction

As stated above, the Court may exercise general jurisdiction over Defendant if Defendant's contacts with Texas are "substantial, continuous, and systematic," a standard that is difficult to meet.[34]  Plaintiff argues that general jurisdiction exists over Daylight because of Daylight's business presence in Texas and Daylight's website.

#### 1.   Daylight's Business Presence in Texas

To support his argument that Daylight has a general business presence in Texas, Plaintiff points both to Daylight's sales to Texas stores and to the licenses it has granted to its licensees.[35]

Daylight has presented evidence that it has no office or registered agent in

---

[33]   *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 487 (5th Cir. 2008); *Wein Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 215 (5th Cir. 1999) (citing *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 421 (5th Cir. 1993)).

[34]   *Johnston*, 532 F.3d at 609; *id.* at 610-11 (reviewing past cases "to illustrate just how difficult it is to establish general jurisdiction").

[35]   Response, at 4 ("Defendant signed contracts with at least 40 Texas business owners to become licensees for Defendant and Defendant makes routine and systematic sales of ingredients and equipment with these businesses.  These contacts are sufficient to establish general jurisdiction.").  Plaintiff also argues that Daylight "continuously and systematically used its name and trademark of Daylight Donuts in Texas to advertise and identify its roughly 40 stores," and that the Daylight stores in Texas are "permanent offices" from which Defendant "conducts business regularly." *Id.* at 4-5.

Texas, and employs no Texas residents.[36]  To be sure, Daylight regularly ships raw products such as flour and coffee to its Texas customers, *i.e.*, independent stores in Texas carrying the Daylight name.[37]  However, Daylight argues that, under the Fifth Circuit's opinion in *Access Telecom, Inc. v. MCI Telecomms. Corp.*,[38] these regular contacts with Texas stores amount to doing business *with* Texas, rather than *in* Texas, and therefore do not establish "minimum contacts" with the forum for general jurisdiction purposes.

In *Access Telecom*, the Fifth Circuit considered whether it could exercise jurisdiction over Telmex, a Mexican telecommunications provider.  The Fifth Circuit described Telmex's contacts with Texas as "numerous," including leasing telephone circuits between Texas and Arizona, leasing real property in Texas, paying taxes to Texas, contracting to warehouse telephone poles in Texas, and collecting revenues from Texas residents "total[ing] millions of dollars a month."[39]  After examining these contacts *in toto*, the Court concluded that they were insufficient to confer general jurisdiction:

---

[36]     Bond Declaration, at 2, ¶¶ 10-11.

[37]     *Id*. at 1, ¶ 3.

[38]     *Access Telecom*, 197 F.3d at 716-18.

[39]     *Id*. at 717.

[W]hile Telmex's . . . contacts may be continuous and systematic contacts which constitute doing business *with* Texas, Telmex has virtually no contacts which constitute doing business *in* Texas. Primarily, Telmex interconnects its Mexican lines with American lines, enabling long distance communication. The money U.S. companies pay Telmex is for service on the Mexican leg of the call; the money the U.S. carriers receive is for the U.S. leg of a call. As such, Mexican and U.S. telecommunications companies do business *with* each other in these situations, but neither is doing business *in* the other country for jurisdictional purposes.[40]

The factual situation in *Access Telecom* is analogous to the facts at bar.[41] Daylight, an Oklahoma corporation, does regular business *with* various Texas companies, but those entities are independently owned stores in Texas that use the "Daylight" name. Daylight collects revenue from its sales to these independent entities in Texas,[42] just as Telmex collected substantial monthly revenue from its Texas customers. The business conducted *in* Texas, however, is conducted by the

---

[40]   *Id.* (citation omitted) (emphasis original).

[41]   In fact, the record reveals that Daylight's contacts with Texas are fewer than those of Telmex, which the Fifth Circuit found insufficient. Whereas Telmex had leased telephone circuits, real property, and warehouse space in Texas, *id.* at 717, Daylight "has no offices or warehouses or other facilities in Texas." Bond Declaration, at 2, ¶ 11. The *Access Telecom* Court also noted that SBC, a division of Southwestern Bell, was a Texas contact of Telmex's and owned a portion of a controlling interest in Telmex. *Access Telecom*, 197 F.3d at 717. By contrast, Plaintiff has identified no Texas contact of Daylight's that has any controlling interest in Daylight.

[42]   Bond Declaration, at 1, ¶¶ 3-4. Presumably, payments from Daylight's customers are sent to Tulsa, Oklahoma where Daylight is based. The parties have not presented evidence as to where Daylight receives the payments. There is no record evidence of a Daylight bank account in Texas.

independent Texas entities, not by Daylight.  Although Plaintiff argues that Daylight

conducts business in Texas by virtue of the licenses it grants to the Texas store

owners,[43] this contention is without factual support.  Daylight does not receive any

royalties or percentages from the Texas stores, and does not monitor their operations.[44]

In *Johnston*, the Fifth Circuit reaffirmed *Access Telecom*, holding that general

jurisdiction requires that a defendant "have a business presence *in* Texas."[45]  The

*Johnston* Court found no general jurisdiction over one defendant, MDS Canada,

whose contacts with Texas included the coordination and design of pharmaceutical

trials performed by independent physicians located in Texas,[46] as well as the sale of

products and related services to Texas customers.[47]  This *Johnston* defendant's total

sales in Texas were in the millions of dollars for each of five years, but amounted to

---

[43]     Response, at 4.

[44]     Bond Declaration, at 2, ¶ 5 ("Daylight receives no royalty payments, percentage of
sales, or payments of any kind from the sales of its customers' products"); *id.* ¶ 7
("Daylight does not monitor the business, sales, or marketing of its customers' stores
and does not interfere in or manage any of the day to day operations of its customers'
businesses"); *id.* ¶ 10 ("Daylight employs no Texas residents, and has no agents who
are Texas residents").  *See* Website, at 6 (Daylight licensees keep all profits from their
stores and do not pay percentages or fees to Daylight).

[45]     *Johnston*, 523 F.3d at 611 (emphasis original).

[46]     *Id.* at 613 (noting that "less than ten percent" of the defendant's contacts with
independent testing facilities were with Texas doctors).

[47]     *Id.*

2.5% or less of the defendant's total global sales for four of the years.[48]   The Court held that these sales of products and services to Texas customers were insufficient alone, and when considered with other contacts, noting that "neither the total amount of sales nor the percentage of annual sales is substantial or regular enough to create a general presence in Texas."[49]   Therefore, under recent Fifth Circuit authority, the fact that a defendant makes some regular sales to Texas customers, without more, is insufficient to establish general jurisdiction.[50]   A court must consider factual detail to determine whether the defendant's sales into the forum are "substantial or regular" enough.[51]   In the case at bar, Plaintiff has presented no evidence that establishes that Daylight's sales in Texas are sufficiently "substantial or regular."  Indeed, there is no evidence about the volume of Daylight's sales in Texas or the percentage of Daylight's total sales attributable to Texas.   Plaintiff, who must present facts supporting a *prima facie* case of jurisdiction,[52] has not met his burden.

---

[48]   *Id*. at 614.  The sales percentage for the fifth year is not provided in the *Johnston* opinion.

[49]   *Id*.

[50]   *Id*. (citing, *inter alia*, *Dalton v. R&W Marine, Inc*., 897 F.2d 1359, 1362 (5th Cir. 1990) (defendant did not have general presence in the forum state despite earning over twelve percent of its revenue from sales in the state)).

[51]   *See id.*

[52]   *See, e.g.*, *Freudensprung*, 379 F.3d at 342-43.

## 2.    Daylight's Website

Plaintiff argues that Defendant Daylight operates an interactive website sufficient to establish minimum contacts with Texas.[53]  Whether personal jurisdiction can be constitutionally exercised over a defendant based on operation of a website depends on the "nature and quality of commercial activity that an entity conducts over the Internet."[54]  A defendant's internet use is analyzed under a spectrum of three areas. At one end of the spectrum, personal jurisdiction is proper in  situations where "a defendant clearly does business over the Internet by entering into contracts with residents of other states which involve the knowing and repeated transmission of computer files over the Internet."[55]   At the other end of the spectrum, personal jurisdiction is inappropriate for "passive websites" that do "nothing more than advertise on the Internet."[56]  In the middle of the spectrum, for websites that "allow[] a user to exchange information with a host computer," proper exercise of personal jurisdiction depends on "the level of interactivity and commercial nature of the

---

[53]     Response, at 5-6 (arguing that website allows users to exchange of information with Daylight and that Daylight has paid search engines directing users to its website).

[54]     *Mink v. AAAA Dev. LLC*, 190 F.3d 333, 336 (5th Cir. 1999) (citing *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa. 1997)).

[55]      *Id.* (internal quotation marks and citations omitted).

[56]     *Id.*

exchange of information" on the website.[57]

The Fifth Circuit has noted that this sliding scale does not fit easily into the general jurisdiction inquiry:

> While we deployed this sliding scale in *Mink v. AAAA Development LLC*, it is not well adapted to the general jurisdiction inquiry, because even repeated contacts with forum residents by a foreign defendant may not constitute the requisite substantial, continuous and systematic contacts required for a finding of general jurisdiction—in other words, while it may be doing business *with* Texas, it is not doing business *in* Texas.[58]

Nevertheless, even when applying *Mink*'s sliding scale to this case, most of the content on Daylight's website falls clearly into the "passive website" category. Plaintiff's evidence shows that Daylight's website includes general information about the company and information about owning a Daylight store.[59]  The website also provides a store locator that allows the user to locate a Daylight store by typing in the zip code or state, lists of Daylight locations in each state and country, and a telephone number and email address for contacting Daylight.[60]  This posted information about

---

[57]    *Id.* (internal quotation marks and citations omitted).

[58]    *Revell v. Lidov*, 317 F.3d 467, 471 (5th Cir. 2002) (defamation case).

[59]    Website, at 2-8.

[60]    *Id.* at 10-12, 16.

Daylight's products and services is merely a passive advertisement.[61]

The website also has two features that are more interactive: an online pre-application form[62] and an online store from which users can purchase Daylight advertising products, including coffee, mugs, collectibles, cups, hats, and apparel.[63] Although maintenance of a website "is, in a sense, a continuous presence everywhere in the world," Plaintiff's evidence regarding Daylight's interactive website features is insufficient under Fifth Circuit precedent to establish "substantial" contacts by Daylight with Texas.[64]   Regarding the pre-application form, the record contains no evidence regarding actual online submissions of the form, and no evidence that any online forms were submitted by Texas residents.  As for the online store, the record again contains no evidence pertaining to Daylight's sales over the website, and thus no evidence of sales to Texas residents.[65]  In *Mink*, in which the website in question

---

[61]   *See Mink*, 190 F.3d at 336-37.  In addition, the website contains a portal that allows existing owners of Daylight stores to login to a message board.  *See* Website, at 15. This website feature is irrelevant to the Court's general jurisdiction inquiry because the message board, which is password protected, is inaccessible to the general public. *See* Bond Declaration, at 3, ¶ 14.

[62]   Website, at 9. The pre-application form can be filled out online, and the website states that the company will respond by telephone.  *Id.*

[63]   Website, at 13-14.

[64]   *See Revell*, 317 F.3d at 471.

[65]   It appears likely that Daylight's primary market for the products in the online store
(continued...)

did not allow for online purchases, the Fifth Circuit noted the lack of evidence that the defendant "conducted business over the Internet by engaging in business transactions *with forum residents*."[66]   The mere existence of a website through which customers in Texas or elsewhere may theoretically purchase Daylight goods, an adjunct to Daylight's primary business of selling donut flour and coffee, is not evidence of substantial, continuous, and systematic contact required for a finding of general jurisdiction.[67]   There is no evidence in the record of website transactions between Daylight and Texas residents.  Moreover, assuming that evidence of such transactions existed, there is no indication that the volume of transactions was sufficiently "substantial" to support general jurisdiction.[68]  Thus, there is insufficient evidence that

---

[65]       (...continued)
        are its customers who operate stores under the Daylight name.

[66]       *See Mink*, 190 F.3d at 337 (emphasis added).

[67]       *See and compare Revell*, 317 F.3d at 471 (contrasting the facts in the seminal general jurisdiction decision in *Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437, 438 (1952), in which general jurisdiction in Ohio was held to exist because Ohio was the place where the corporate president's residence was located, where corporate records were kept, where director's meetings were held, where bank accounts were held, and where all key business decisions were made).

[68]       *See id.* (in discussion of "substantial" contacts required for general jurisdiction, the *Revell* Court cites with approval to *Bird v. Parsons*, 289 F.3d 865, 873-74 (6th Cir. 2002), which held that Ohio courts lacked general jurisdiction over a non-resident business that registered domain names despite the fact that the defendant had, over its website, registered domain names for over 4,000 Ohio residents).  Following *Mink*, a district court in Texas held, in regard to a specific jurisdiction analysis:

(continued...)

Daylight "clearly conducted business over the Internet," let alone that Daylight "conducted business over the Internet by engaging in business transactions with forum residents or by entering into contracts over the Internet."[69]  Plaintiff thus has not established a *prima facie* case that Daylight, through its website, engaged in "substantial, continuous and systematic contacts"[70] with Texas residents sufficient for a finding of general jurisdiction.

### 3.    Aggregate Contacts

The Court has considered Daylight's contacts with Texas, taken *in toto* and resolving all factual conflicts in favor of Plaintiff.  Even considered in combination, these contacts "are not so substantial that it 'should have reasonably expected to be sued in Texas on any matter, however remote from [those] contacts.'"[71]

Because Plaintiff has failed to establish a *prima facie* case of minimum

---

[68]  (...continued)
   For personal jurisdiction to exist on the basis of an interactive website, it is not enough that a defendant appears to have the potential to interact with, sell products to, and contract with Texas residents.  Rather, *there must be evidence of such activity having occurred.*

*Triple Diamond Energy Corp. v. Venture Research Inst., Inc.*, 2008 WL 2620352 (N.D. Tex. July 3, 2008), *6 (emphasis added).

[69]  *See Mink*, 190 F.3d at 337.

[70]  *See Revell*, 317 F.3d at 471.

[71]  *See Johnston*, 523 F.3d at 613 (quoting *Wilson v. Belin*, 20 F.3d 644, 650 (5th Cir. 1994) (alteration in original)).

contacts, the Court need not address the second prong of the analysis, *i.e.*, whether exercise of general personal jurisdiction over Daylight would comport with traditional notions of fair play and substantial justice.

### B.   Specific Jurisdiction

Under minimum contacts analysis for specific personal jurisdiction, a court may properly exercise jurisdiction over a non-resident defendant that has purposely directed its activities toward the forum state if the controversy "arise[s] out of or [relates] to the defendant's contacts with the forum state."[72]   The present dispute arises from Qassas' efforts to perform his duties as international marketing representative for Daylight outside of the United States.   The dispute is unrelated to the products shipped by Daylight to its Texas customers.   Therefore, whether or not Daylight has purposefully availed itself of the Texas market by shipping products to Texas, these contacts are insufficient to confer specific jurisdiction on this Court.[73]

Daylight's contract with Qassas, a Texas resident, and related communications

---

[72]   *Freudensprung*, 379 F.3d at 343.   Although Plaintiff's briefing seems exclusively focused on general jurisdiction, the Amended Complaint pleads the existence of both general and specific jurisdiction.

[73]   Similarly, operation of Daylight's website, which is accessible to Texas residents, is irrelevant to the specific jurisdiction inquiry because the dispute at bar is unrelated to Daylight's website.

directed to Texas, also are insufficient.[74]   The Fifth Circuit has held that minimum

contacts cannot be established by "merely contracting" with a resident of the forum,

nor by "[a]n exchange of communications in the course of developing and carrying

out a contract," because, were it otherwise, "jurisdiction could be exercised based only

on the fortuity that one of the parties happens to reside in the forum state."[75]   In this

case, the agreement between the parties related to development of Daylight's

international business, and the contacts with Texas were a mere "fortuity" of Qassas'

residence.[76]   Moreover, although it was foreseeable that Qassas might perform his

contractual duties in Texas, and might sign, notarize, or legalize documents in Texas,[77]

---

[74]   Plaintiff states that the letter memorializing his employment agreement with Daylight and his termination letter both were mailed to his home in Texas.  Qassas Affidavit, at 3, ¶ 10; *id*. at 4, ¶ 16.

[75]   *Moncrief*, 481 F.3d at 311-12. *See Freudensprung*, 379 F.3d at 344 ("this Court has repeatedly held that the combination of mailing payments to the forum state, engaging in communications related to the execution and performance of the contract, and the existence of a contract between the nonresident defendant and a resident of the forum are insufficient" to establish minimum contacts).

[76]   *Moncrief*, 481 F.3d at 312 ("a plaintiff's unilateral activities in Texas do not constitute minimum contacts where the defendant did not perform any of its obligations in Texas, the contract did not require performance in Texas, and the contract is centered outside of Texas").

[77]   *See* Response, at 1 (noting that "the contracts which gave rise to" Plaintiff's lawsuit, *i.e.*, the contracts with Daylight clients in foreign countries, were notarized and certified in Texas).

"mere foreseeability, standing alone, does not create jurisdiction."[78]

Plaintiff has not established a *prima facie* case of minimum contacts.  As with general jurisdiction, given the Court's holding that Daylight's contacts with Texas do not support the exercise of specific personal jurisdiction, the Court need not address the issues of fair play and substantial justice.

### C.   Venue

In light of the conclusion that the Court lacks personal jurisdiction over Daylight, the Court need not address Daylight's motion to dismiss under Rule 12(b)(3) for improper venue.[79]  In addition, Daylight's alternative request for transfer of venue under 28 U.S.C. § 1404(a) is moot.

## IV.   CONCLUSION

For all of the foregoing reasons, it is hereby

**ORDERED** that Defendant Daylight's Motion to Dismiss [Doc. # 10] is **GRANTED**.  This action is **DISMISSED** for lack of personal jurisdiction.  Daylight's alternative motions for dismissal based on improper venue or transfer of venue are **DENIED AS MOOT**.  It is further

**ORDERED** that Plaintiff's Motion to Lift the Stay on Discovery Per Rule 11

---

[78]     *Moncrief*, 481 F.3d at 313.

[79]     FED. R. CIV. P. 12(b)(3).

Agreement [Doc. # 28] is **DENIED AS MOOT**.  It is further

  **ORDERED** that Defendant's Motion for Extension of Time [Doc. # 24] is

**DENIED AS MOOT**.

  SIGNED at Houston, Texas, this **24ᵗʰ** day of **June, 2009**.

<br>

             _____

               Nancy F. Atlas

            United States District Judge